UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x
Stephanie EXARHAKIS,

                Plaintiff,

    -against-

VISITING NURSE SERVICE OF NEW           <u>MEMORANDUM AND ORDER</u>
YORK,                                  02-CV-5562 (ILG)
VISITING NURSE SERVICE OF NEW
YORK LONG TERM DISABILITY PLAN,
and FIRST UNUM LIFE INSURANCE
COMPANY

                Defendants.
-------------------------------------------------x

GLASSER, United States District Judge:

# **INTRODUCTION**

Plaintiff Stephanie Exarhakis ("Exarhakis" or "plaintiff") brings claims against

her former employer, Visiting Nurse Service of New York Home Care ("VNS" or

"employer") and insurance carrier First Unum Life Insurance ("Unum" or "insurer")

(collectively, "defendants") for alleged violations of the Americans with Disabilities Act

of 1990, §42 U.S.C. §12101 <u>et</u> <u>seq</u>. ("A.D.A."), the Rehabilitation Act of 1973, as

amended, 29 U.S.C. §794, <u>et</u> <u>seq</u>, the New York State Human Rights Law, N.Y. Executive

Law § 290, <u>et</u> <u>seq</u>. ("NYSHRL"), the New York City Human Rights Law, N.Y.C.

Administrative Code §8-101, <u>et</u> <u>seq</u>., ("NYCHRL"), and the Employee Retirement

Income Security Act of 1994, as amended, 29 U.S.C. § 1001, <u>et</u> <u>seq</u>. ("ERISA").

Exarhakis alleges VNS unlawfully terminated her employment in violation of the A.D.A.,

Rehabilitation Act, NYSHRL, and NYCHRL, as well as breached its fiduciary duty to her

and concealed benefits from her in violation of ERISA. She also alleges that Unum breached a contract and violated ERISA when it denied her application for long term disability benefits. Before the Court are VNS's and Unum's motions for summary judgment, as well as a motion to dismiss by Unum. In opposition, Exarhakis contends that material issues of fact preclude the granting of these motions.

## **BACKGROUND**

For three years beginning in 1995, Stephanie Exarhakis, had been a social worker and clinical supervisor at VNS, which provides a variety of home health care and community-based services throughout the New York Metropolitan area. Ms. Exarhakis sustained serious injuries in a 1998 accident, which by all accounts dramatically and permanently changed her life. This lawsuit is set against two and a half years, from March 1999 until September 2001, in which Ms. Exarhakis worked part-time for VNS while recovering from and learning to cope with her injuries, which required extensive and painful changes to her personal and professional lives.

The relevant facts, either undisputed, or, where disputed, cast in light most favorable to the plaintiff are as follows:[1]

Exarhakis was employed by VNS in June 1995 as a Manager of Care Management Services in the Agency's Elder Care Services program. (56.1, ¶1.) She had extensive responsibilities including the clinical supervision and oversight of support staff, development of policies, procedures, training and orientation programs, and preparation of budgets. She participated in marketing, and traveled among four

---

[1] Where undisputed, Defendant VNS's 56.1 statement is referenced as "56.1." Otherwise, Defendant VNS's 56.1 statement is referenced as "Def.56.1" and Plaintiff's 56.1 statement is referenced as "Pl.56.1."

company offices, community groups, and national organizations to make presentations. She had direct clinical care responsibilities for a caseload of older adults living throughout the community, and was on-call around the clock for emergencies. (See Flor. Aff., Exhibit 24 at P0167).

When she was hired, Exarhakis attended a New Employee Orientation. (Ex. Dep., 167-68). Defendant's "New Hire Orientation" procedures instructed orientation personnel to describe the benefits plans, including the VNS Long Term Disability Plan ("LTD Plan"). (Affidavit of Steven A. Rosen in Opposition to Defendants' Motions for Summary Judgment, ("Rosen Aff."), Exhibit 7 at V770). As a matter of practice, VNS asserts that it includes copies of benefits plan descriptions in its packet of materials distributed to new employees. (Armstrong Deposition, 88-90, 98; Hildebrand Deposition, 79-80; Davin Deposition, 33-34). Nonetheless, Exarhakis does not recall the mention of the LTD Plan at the orientation, nor receiving written information about it in the materials that were distributed. (Ex. Dep. at 167).

Exarhakis acknowledges that she received, filed, and maintained "annual benefits statements" from VNS, beginning with her 1996 statement, but she does not know when she received them and did not read them carefully either before or after her accident. (Ex. Dep. at 164-66, 404-05, 407). The annual statements have a section entitled "Long-Term Disability," which reads, in part, "Your Long-Term Disability (LTD) Insurance Plan with Unum Insurance Company provides you with income in the event that you become totally disabled for more than six months. LTD payments continue as long as you are totally disabled, generally up to 65." (Affidavit of Evan Gordon, ("Gor. Aff."), Exhibit C at P0838). The statements do not contain specific details about the

terms of the plan, but they do provide notice that the plan exists and summarize the value of benefits available to Exarhakis in the event of a long term disability.  (Id.)

In September 1998, Exarhakis was hit by a truck, sustaining serious head, eye, and pelvis injuries that kept her out of work for nearly six months. (Ex. Aff., ¶7,  Ex. Dep. at 15, 20).  Incapacitated in the months following her injury, Exarhakis relied upon her companion, Jane Morris, to assist her with many aspects of her recovery.  (Ex. Aff., ¶8). Ms. Morris continues to be her health care proxy and has had power of attorney since shortly after the accident. (Id.)

Morris had numerous conversations on behalf of Exarhakis with VNS human resources personnel, regarding time off, health coverage, and benefits. (Pl.56.1 ¶¶ 13-16). In the course of these conversations, Morris received information about Exarhakis's available sick time, vacation time, and donated time, as well as leave of absence and short term disability benefits.  (Rosen Aff., Exhibit 2 ("Morris Dep."), 16-21). Defendants provided leave of absence and short term disability forms, which Exarhakis completed with Morris's assistance.  (56.1, ¶16).  Morris recalls repeatedly asking for information related to Exarhakis's benefits eligibility, but that the LTD Plan was never mentioned to her.  (Morris Dep. at 18, 24).  Neither Exarhakis, nor Morris, ever specifically asked for information related to the LTD Plan, according to Exarhakis, because they didn't know such benefits existed. (Def.56.1, ¶13; Pl.56.1, ¶13).  Morris never asked Exarhakis if she had any documents relating to benefits.  (Morris Dep. at 24-25).

After her accident in September, 1998, Exarhakis exhausted her accumulated leave time, as well as short-term disability benefits. (Id., ¶17).  In addition to the

accumulated leave to which Exarhakis was entitled, VNS granted Exarhakis a discretionary leave of absence until mid-February 1999, and extended it until March 22, 1999. (56.1, ¶16, ¶19).  The leave of absence allowed Exarhakis to gratuitously maintain her health coverage while she continued her out-of-work recovery.  (Id., ¶19).

In January, 1999, Holly Michaels Fisher at VNS contacted Exarhakis to discuss organizational changes at VNS and the possibility of Exarhakis's returning to work. (56.1, ¶21).  Prior to Exarhakis's injury, VNS had already begun a reorganization that effected Exarhakis's job responsibilities. During the period of time Exarhakis was recovering from her accident, the reorganization continued and VNS eliminated her prior position, with some of her previous responsibilities reassigned.  (Ex. Dep. at 11-14, 79-81; Pl.56.1, ¶22).  In any event, had Exarhakis's position not been eliminated in the reorganization, she would not have been able to return to it following her accident because her injuries precluded her from being able to perform the duties of that position, either with or without accomodation. (Ex.Dep. at 86).

Fisher and Exarhakis discussed whether VNS could offer Exarhakis a means to return to work with the agency. (56.1, ¶26).  VNS offered, and Exarhakis accepted, an opportunity to perform project-based work in the VNS CHOICE program, a managed care program for the elderly administered under the VNS umbrella.  (Id., ¶26).  Her supervisor would be Sandra Hallstead.  (Id.).  While Exarhakis formally maintained her former job title after the accident, the scope and responsibilities of the job that she returned to were significantly different, and vastly reduced, as a result of her limitations. (Compare, Ex. Dep. at 11, 14-15  with Ex. Dep. at 87-90; Compare Ex.Aff., Exhibit 1, "Performance Appraisal" dated 2/18/98 with Ex.Aff., Exhibit 1, "Performance

Appraisal" dated 2/8/00, "Performance Appraisal" dated 2/8/01; <u>See also</u>, <u>Florentino Affidavit</u>, ("Fl. Aff."), Exhibit 26 ("Hearing Before the Workers Compensation Board") at 3-4.).

Exarhakis wanted to return to work at VNS, and was glad that VNS offered a flexible position so that she could continue to receive significant income and benefits. (<u>Pl.56.1</u>, ¶24). The new job permitted her to perform assigned projects on a part-time basis and offered her extraordinary flexibility in both scheduling her hours and the conditions under which she worked, permitting her to do much of her work from home. (<u>Id.</u>, ¶38). For two and a half years after her return to work, VNS provided Exarhakis with flexible project-based work from the VNS CHOICE program. (<u>Id.</u>, ¶39). Exarhakis's work was generally satisfactory, and her evaluations reflect that for the years of 1999, 2000, and 2001. (<u>See</u> <u>Ex.Aff.</u>, Exhibit 1, "Performance Appraisals").

Shortly after returning to work, Exarhakis applied for Workers' Compensation benefits on the basis of her September 1998 accident. (<u>56.1</u>, ¶3)6. A hearing was held on April 10, 2003, and benefits were ultimately granted. (<u>Pl.56.1</u>, ¶37).

In July 2001, more than two years after Exarhakis returned to part-time work at VNS, VNS hired a full-time social work manager for the VNS CHOICE program because managing the program required at least one full-time person. (<u>Def.56.1</u>, ¶42; <u>Pl.56.1</u>, ¶42). Though Exarhakis had the experience and knowledge to be qualified for that position, she could not have discharged its responsibilities because of her physical limitations. (<u>Ex. Dep.</u>, 158-159). VNS asserts that partly as a result of hiring the social work manager, and partly as a result of the natural development of the VNS CHOICE program, it no longer needed the consulting and project-based work Exarhakis had

performed. (Def.56.1, ¶¶41-42). In August, 2001, Hallstead informed Exarhakis that VNS CHOICE would no longer require her services. (Id., ¶ 41, ¶45).

Also in August 2001, Exarhakis requested from VNS, in writing, written information about her benefits. In the same month, she received a copy of her benefits' summary plan description ("SPD") which included information about the LTD Plan. (Ex. Aff., ¶18; Fl. Aff., Exhibit 20 (PX 44)).

Hallstead advised Exarhakis in early September 2001 that she had no additional project work for Exarhakis, and that Exarhakis should communicate with human resources to determine if another area in VNS might have work that matched her interests and skills and could be performed within her physical limitations. (Def.56.1, ¶45; Pl.56.1, ¶58-60; Rosen Aff., Exhibit 4 (Pl. Exhibit 28)). Exarhakis acknowledges Hallstead said this, but contends that the reasons given to her by Hallstead for the elimination of her position were pretextual, and that Hallstead stopped giving her work because she no longer wanted to accomodate her disabilities. (Pl.56.1, ¶45). As evidence for this allegation, Exarhakis points to a number of actions Hallstead took during the summer of 2001: Hallstead asked her about her medical limitations, expressed new concerns about her work schedule, only reluctantly listed plaintiff's contact information in VNS publications, and denied Exarhakis authorization to contact regional employees in pursuit of what Exarhakis deemed to be her job responsibilities. (Pl.56.1, ¶4). As a result of Hallstead's conversations with Exarhakis, Exarhakis had a series of conversations with human resources personnel between August and October 2001 to explain her physical limitations and requisite accomodations, and to determine whether additional work, or a different position, existed that Exarhakis could

perform.  (Def.56.1, ¶¶47-49, 53, 54; Pl.56.1, ¶54).  After reviewing all available positions at VNS with human resources personnel, Exarhakis and VNS were unable to identify a position that plaintiff could perform, with or without accommodations, because of her numerous physical limitations.  (56.1, ¶¶55-57).  Plaintiff did not apply for any posted position.  (Id. ¶57).  Nonetheless, plaintiff maintains that VNS could have continued to assign her comparable work either from the VNS CHOICE program, or from elsewhere in the agency to maintain her employment.  (Pl.56.1, ¶41).

Also in September 2001, Exarhakis requested assistance from VNS in applying for LTD benefits in the event the parties were unable to identify additional work for her.  (Fl. Aff, Exhibit 20 (DX 23)).  She applied for the LTD benefits on October 21, 2001, contending that her "condition prevents performance of her occupation."  Her application was denied for failure to file within the required limitations period.  (56.1, ¶64).

Exarhakis also applied for Social Security Disability Insurance benefits (SSDI) in October, 2001.  (56.1, ¶65).  In this application, she stated under oath, inter alia, that she gets back pain if she sits, stands, or walks too long; has double vision, and that her vision causes photosensitivity and poor balance; cannot read "at will," but needs to schedule her reading time because it leads to vision problems; has concentration and memory difficulties; requires some oversight by others to follow written and spoken instructions; endures pain as a result of usual activities; does not leave home except on a limited basis, and then only during non-rush hours or uncongested times; cannot go out alone; cannot really engage in social activities on her own, or make standing commitments; and cannot do many activities for more than 10-15 minutes at a time.

(Def.56.1, ¶66).  The physician statement accompanying the SSDI application stated that Exarhakis required 10-20 minutes of rest after each 10-20 minutes of reading or using computers.  (56.1, ¶67).  Plaintiff was eventually approved for SSDI benefits and found to be fully disabled as of October 2, 2001.  (Id., ¶68)

Meanwhile, though Hallstead had stopped assigning work to Exarhakis from the VNS CHOICE program in September, 2001, VNS did not terminate Exarhakis.  While she explored other available job possibilities with human resources personnel and prepared her benefits applications, VNS allowed her to remain active on the payroll until November 15, 2001, with full medical benefits, and required her to do no work in exchange.  From November 15, 2001 through December 18, 2001, VNS paid Plaintiff's accrued leave as salary, rather than in a lump sum, allowing plaintiff to maintain full benefits through December 18, 2001. (56.1, ¶¶ 59-60).  When Exarhakis's accrued payout concluded on December 18, 2001, VNS gratuitously provided her with 10.25 weeks of severance pay, and paid that severance as salary continuance through March 8, 2002 so that she could remain on the payroll and continue to receive her full benefit coverage during the severance period.  (Id., ¶70).

When Exarhakis's severance period expired in March 2002, she was terminated by VNS.  Plaintiff filed her EEOC charge on October 17, 2002.  (Id. , ¶73).  The EEOC issued a right to sue letter on November 29, 2002, and she timely filed this complaint. There is nothing in the record reflecting any determination made by the EEOC.

## **DISCUSSION**

### I.    **Summary Judgment Standards**

Summary judgment under Fed. R. Civ. P. 56(c) is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  When evaluating a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor."  L.B. Foster Co. v. Am. Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986)). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Instead, the opposing party "must designate specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 3242 (1986).  A genuine factual issue exists if there is sufficient evidence favoring the opposing party for a jury to return a verdict in its favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 249, 106 S.Ct. 2505 (1986).

While this Court must be cautious about granting summary judgment in a discrimination case because the employer's intent is often at issue "and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination," see Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999), the "summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."  Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991).  "[T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – [therefore] apply no less to discrimination cases than to

commercial or other areas of litigation." Id. (citation omitted).

## II.    The Timeliness of the A.D.A Claim

The A.D.A., which incorporates Title VII's enforcement provisions by way of 42 U.S.C. §12117, requires plaintiff to have filed a complaint with the E.E.O.C. within 300 days of the allegedly discriminatory employment decision.  See Harris v. City of New York, 186 F.3d 243, 248 (2d Cir.1999) (300-day requirement).  "This statutory requirement is analogous to a statute of limitations."  Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir.1996).  "[T]he limitation period begins to run on the date when the employee receives a definite notice of the termination . . . Moreover, for the notice to be effective, it must be made apparent to the employee that the notice states the "official position" of the employer."  Smith v. United Parcel Service of America, Inc., 65 F.3d 266, 268 (2d Cir.1995)

Plaintiff's EEOC claim was filed on October 17, 2002; if the A.D.A. claim accrued prior to December 23, 2001, then the E.E.O.C. complaint, and the A.D.A. claim, would be time-barred.  The parties dispute the date on which VNS gave Exarhakis "definite notice of the termination."  VNS points to September 5, 2001, the date on which Exarhakis knew or should have known her VNS CHOICE position had come to an end because Hallstead ceased assigning her work.  On this basis, both the E.E.O.C. complaint and the current claim would be untimely.  Plaintiff, however, points to her actual termination date of March 31, 2002, asserting that even though Hallstead ceased assigning her work, she was unaware that VNS officially intended to terminate her, because they continued to assist her in finding other positions within the company.  On the basis of a March 31, 2002 accrual date, the E.E.O.C. complaint was filed

approximately 200 days later, in timely manner.

The termination was an ambiguous process. The record is clear that in mid-August 2001, Hallstead informed Exarhakis of the declining need for her services in the VNS CHOICE program, and that she should seek another position within the agency. This can hardly be considered a termination notice, however, because until at least October 2, when Exarhakis met with Marian Haas, Director of Human Resources to review available jobs, VNS held out hope to plaintiff that another position, or additional work, might be found for her. Moreover, Haas stated that following the October 2 meeting, she and others were still making efforts to find a position for Exarhakis in the company; this while they were also negotiating conditional terms of severance if such work did not exist. (Fl. Aff., Exhibit 15 ("Haas Deposition"), 178). Under such murky circumstances, it's not clear when the official policy of VNS shifted from assisting Exarhakis in finding another position within the company, to termination when a satisfactory alternate position could not be identified.

The record does show that the termination occurred no later than March, 2002. Plaintiff alleges the termination date was March 31, 2002; a letter from Haas states that the official separation date was March 8. (See Rosen Aff., Exhibit PX 40, 42). Either way, the E.E.O.C. claim was timely on the basis of a March termination, as was the filing of this complaint. The A.D.A. claim is not barred by the timing of the E.E.O.C. complaint.

### III.   Plaintiff's Discrimination Claims

The A.D.A. and Rehabilitation Act prohibit employers from discriminating against workers with disabilities. To survive a motion for summary judgment in an

A.D.A. cause of action, the plaintiff must first establish a prima facie case of discrimination by showing (1) she is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of her disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations. See, e.g., Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir.2004). The plaintiff bears the burden of production and persuasion of identifying the job at issue and whether an accomodation exists that would permit her to perform the essential functions of that job. See Jackan v. New York State Dept. of Labor, 205 F.3d 562, 566 (2d Cir.2000); Borkowski v. Valley Cent. School Dist., 63 F.3d 131, 137-38 (2d Cir.1995). The parties do not dispute the first and second elements of the prima facie case; rather, they focus on the third, and by implication, the fourth.

### A. The effect of extraordinary accomodations

The "job at issue," in this case is the special projects position that was created for Exarhakis to enable her to return to work. This is a necessary conclusion because Exarhakis's prior position, as clinical supervisor, was reorganized out of existence while she was on leave from her accident in 1998 and Exarhakis acknowledges that she could not, in any event, have returned to perform the duties of that position either with or without accomodation. The special projects position, however, no longer exists. The dispute between the parties centers upon the reason for the position's discontinuation and the effect of its discontinuation.

The "essential functions" of this new job were never clearly defined. VNS claims that the "essential functions" were to complete discrete, project-based tasks for the VNS

CHOICE program. Thus, the job was functionally a temporary position that ended when it ran its course; Exarhakis was not terminated because she was disabled, but because projects in the VNS CHOICE program were completed and there were no other identifiable positions within the VNS organization that Exarhakis could perform either with or without accomodation. Exarhakis takes a broader view of the "essential functions" of the new job, claiming that the function of the special projects position was to use her knowledge and experience as an ongoing resource to the organization to incubate and develop new projects. With this understanding, she viewed the job created as a permanent position, and deems the justification offered for the discharge pretextual, implying that her termination is analogous to a discriminatory reduction in force. See, e.g., Kinsella v. Rumsfeld, 320 F.3d 309, 314 (2d Cir.2003) (employer may not use lawful reduction in force as pretext for termination with discriminatory intent).

As evidence of the essential functions of a job, EEOC regulations encourage an examination of:

(i) The employer's judgment as to which functions are essential;
(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 CFR § 1630.2.

Other than VNS's characterization of the essential functions of the job, described above, an examination of these factors is inconclusive. There is no evidence of a written job description prepared before hiring Exarhakis. Because the job was created solely for

14

her, there was no advertising or interviewing of applicants, no comparable past incumbents or current incumbents of similar jobs, and there is no evidence that VNS would have faced any consequences whatsoever had it not created the position. What is clear is that the job was conceived of in an informal manner, at the initiation of VNS, and that from the time she returned, both Exarhakis and her supervisor expressed ongoing concerns about the scope of the job and procedures for insuring her supervision. See Ex. Aff., Exhibit 1 ("Performance Appraisals"), V18-35. Based solely on VNS's judgment as to the essential functions of the job, summary judgment would be appropriate in favor of VNS if this case turned only upon the factual proposition that the organization ceased to need the services associated with the special projects position that was created for Exarhakis.

The resolution of whether the job constituted a "reasonable accomodation," however, compels the Court to grant summary judgment for the defendant. It is well-settled law that an employer need not create a new job to accomodate a disabled employee; such an accomodation is unreasonable as a matter of law. See, e.g., Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 99 (2d Cir.1999) ("the employer [is not] obliged to create a new position to accommodate the employee.") (citing Willis v. Pacific Maritime Ass'n, 162 F.3d 561, 567 (9th Cir.1998)). That is precisely what VNS did, however, to enable Exarhakis to return to work and continue to receive income and benefits. The record is undisputed that the special projects position did not exist prior to her injury, that it was created exclusively with Exarhakis's experience, capabilities, and limitations in mind, and that had this position not been created, plaintiff could not

have returned to work.[2]  VNS was under no obligation to create this special position for her in 1999; it would have been well-within its rights to have terminated Exarhakis, who was unable to perform the essential functions of any position within the organization.

The crux of the legal question presented by this case is whether an employer who offers an extraordinary accomodation beyond what it is required to do by law, in this case a new job created solely to accommodate an employee who became totally disabled, can be subject to A.D.A. liability when that unreasonable accomodation becomes untenable.  The principle on which the question is resolved is similar, but not precisely analagous, to the cases cited by VNS.  See King v. Wallkill, 302 F.Supp.2d 279 (S.D.N.Y.2004); Parnahay v. United Parcel Service, 20 Fed.Appx. 53 (2d Cir.2001) (unpublished); Lalla v. Consolidated Edison Co., 2001 WL 456248 (S.D.N.Y.2001) (unpublished).  Those cases extend the proposition that an employer has no A.D.A. obligation to create a new position as an accomodation to hold that an employee has no right to have temporary light-duty assignments made permanent when the employee is unable to perform the essential functions of either her existing permanent job or any other available permanent job in the organization.  Taking the facts in the light most favorable to Exarhakis, this is a case in which the employer offered the plaintiff, who was admittedly unable to perform the essential functions of any existing position with or without reasonable accomodation, not simply temporary light-duty work, but the extraordinary accomodation of a new permanent position designed to enable her to return to work.  Subsequently, that position became superfluous to the organization.

---

[2]  This final conclusion is bolstered by the fact that shortly after being terminated from VNS's employ, plaintiff was granted total disability benefits from the Social Security Disability program.

Under these circumstances, this Court holds that VNS exceeded its obligations under the A.D.A. and cannot be found liable for failing to continue to gratuitously provide an accomodation that it was not legally obligated to.

This holding is in accord with other courts that have observed that where an employer has accommodated an employee in excess of what the law requires, the discontinuance of those extraordinary accomodations cannot give rise to an A.D.A. violation.  See, e.g., Vande Zande v. State of Wis. Dept. of Admin., 44 F.3d 538, 545 (7th Cir.1995) (when an employer "bends over backwards to accommodate a disabled worker—goes further than the law requires—. . . it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation."); Bonner v. New York State Elec. & Gas Corp., 195 F.Supp.2d at 435; Feeley v. New York City Police Department, 2001 U.S.Dist. LEXIS 25431, 30 n.10 (E.D.N.Y.2001); Rhoades v. Atchison-Holt Elec. Coop, 1997 WL 839482, 7 (W.D.Mo.1997).

The purpose of the A.D.A. is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  It is a statute which "demonstrates the compassion of Congress for persons with disabilities and its determination to create an enforceable rule of law to oblige employers to go to considerable lengths to make it possible for disabled persons to work productively." Borkowski, 63 Fed. Rep. 3d at 144 (Newman, J., concurring).  It does not, however, require an employer who has gone beyond the considerable lengths required by law and compassionately created a new position as an extraordinary accommodation to a disabled employee, to extend that position indefinitely.  Cf. Smith

v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d 1154, 1177 (10th Cir.1999) (en banc) ("The ADA does not entitle an employee to a free ranging or perpetual right to a new position within the company.").  Whether the extraordinary accomodation is temporary, light-duty employment while a disabled employee recovers, or an entirely new position that is created to assist a disabled employee's return to work, to hold an employer liable for discontinuing such an extraordinary accomodation would defeat the goals of the A.D.A. by chilling employers from compassionately working with disabled employees.  Plaintiff's contention that the two and a half year duration of the special projects position is relevant to defendant's liability is flawed; the duration of an extraordinary accommodation does not transform it into a reasonable one.  See Bonner, 195 F.Supp.2d at 431 (two-year and seven-year light duty assignments need not be extended).

The undisputed evidence in this case demonstrates that even after it could no longer offer Exarhakis special projects to work on, VNS made thorough efforts to cooperate with Exarhakis in identifying any other positions within the organization that she could perform with reasonable accommodations.  Their collective inability to identify any other position in the organization that she could have performed either with or without accommodation only re-enforces the extent of her disabilities, the impossibility that she would have been able to work at all but for the extraordinary accommodation, and the commendable and genuine efforts VNS made to keep her employed for nearly three years.  Given Ms. Exarhakis's extensive limitations, VNS far exceeded the requirements of the A.D.A. in keeping her on the payroll and creating work for her from 1998 through 2001.  Because she cannot identify any position for which she

is qualified and the essential functions of which she could fulfill, either with or without reasonable accomodations, this Court is compelled to grant summary judgment for the defendants on plaintiff's A.D.A. and related claims.

**B.    The insufficient evidence of discriminatory animus**

Though the failure to identify a reasonable accomodation is in any event fatal to her A.D.A. claim, Exarhakis has also failed to provide any evidence of discriminatory animus on which the Court could conclude that VNS's stated reason for discontinuing the special projects position or terminating her was pretextual.  In analyzing such a claim, we apply the burden-shifting analysis set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973):

> Under McDonnell Douglas, plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination.  The burden of production then shifts to defendants, who must offer through the introduction of admissible evidence a non-discriminatory reason for their actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action.  Plaintiff then must show that the proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more.

Heyman v. Queens Village Committee for Mental Health, 198 F.3d 68, 72 (2d Cir.1999) (internal citations omitted); See also Chambers v. TRM Copy Centers Corporation, 43 F.3d 29, 37 (2d Cir.1994).

Assuming, arguendo, that Exarhakis has stated a prima facie case of discrimination, and that VNS has proffered a legitimate non-discriminatory reason for her termination, plaintiff has nonetheless failed to demonstrate that VNS's explanation is unworthy of credence.

To discern whether an inference of discrimination exists, the Court looks for such circumstances as

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in [disability-related] degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group.

Chambers, 43 F.3d at 37.

Plaintiff has not provided any evidence that VNS sought a person of her qualifications to fill the "special projects" position that was created for her once she was terminated. She has not alleged that able-bodied employees received more favorable treatment than she did. As to whether VNS criticized her performance in disability-related degrading terms, or made invidious comments about others in the employee's protected group, the record provides the slenderest of reeds on which plaintiff can state her case. Plaintiff asserts that in the summer of 2001, shortly before she was informed that VNS no longer required her services in the special projects position, Hallstead, who had been her supervisor since she returned in 1999, inqured into her disability status, displayed "discomfort" with the structure of plaintiff's position and denied her attempts to extend her reach throughout the agency and develop new projects. Moreover, Exarhakis states that one coworker "grilled her" about her Workers' Compensation claim. On the basis of her characterizations of these events, Exarhakis asserts that the decision to discontinue the position was pretextual and that discrimination can be inferred.

These conditions do not give rise to a rational inference of discrimination,

especially in the context of the other events that transpired, including VNS offering her gratuitous leaves of absence, creating a new position for her, allowing her a tremendous amount of flexibility in the work created for her, and reviewing her work positively. No evidence in this record, beyond plaintiff's bald allegations, suggests that defendant's explanation should not be credited.

Summary judgment is appropriate "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000). In this case, the record conclusively reveals a nondiscriminatory reason for the employer's decision. Moreover, plaintiff has created only the most ephemeral issues of fact with respect to defendant's intent. She asserts in conclusory fashion that the motivation behind both her supervisor's actions and VNS's ultimate decision to terminate her was animus. But the record in this case provides abundant and uncontroverted evidence that there was no animus towards defendant on the basis of her disability. On the contrary, the record conclusively establishes that VNS manifested an admirable concern for her. Before she returned to work in 1999, VNS, without obligation, extended her leave of absence and medical disabilities. VNS created a special position for her in 1999 to help her retain medical benefits and a higher income level than she would have earned from collecting disability benefits. That position was highly flexible, more flexible than any other position in the agency, and extraordinarily responsive to plaintiff's significant, debilitating injuries. Plaintiff was assigned to work under

Hallstead's supervision in 1999, and worked under her for nearly three years without a single allegation of any discriminatory intent related to her disability. When informed her position would be discontinued, Plaintiff was offered an opportunity to review other jobs to see if there was work she could perform; and while she was reviewing those jobs and discussing a possible future with VNS, she was kept on the payroll with benefits despite not performing any work. At the time of her termination, after the parties agreed that there was no position available that she could perform either with or without reasonable accomodations, she was offered a significant severance package with substantially greater benefits than those to which she was entitled. In fact, at every turn of events since her injury, VNS exceeded its legal obligations to plaintiff and offered her extraordinary assistance in helping her to return to work, despite her admittedly totally disabling injuries. To find that the record holds "abundant and uncontroverted" evidence that no discrimination has occurred would be only a half-accurate finding; it ignores the significant affirmative assistance that VNS has offered plaintiff, in light of her disabilities, and beyond its legal obligations. Perhaps this is a result of VNS's mission, which plaintiff points out to the Court, is, in part, "to be a leader in the development of innovative services that enable people to function as independently as possible in their community." (Pl. Aff. ¶ 17). In Ms. Exarhakis's case, VNS has taken its mission beyond the legal requirements of an employer to an employee.

Because she has failed to provide sufficient evidence on which a rational jury could find VNS's proffered justification for her termination was pretextual and that her disability was the real reason for termination, Ms. Exarhakis's discrimination claims cannot survive a motion for summary judgment.

## IV.     ERISA Claims Against VNS

ERISA requires employers to inform participants and beneficiaries about the benefits available to them.  See 29 C.F.R. § 2520.102-2(b).  The most common means for informing participants about their benefits, also a requirement of ERISA, is through the production and distribution of summary plan descriptions ("SPDs") to employees.  29. U.S.C. §1021.  ERISA also imposes upon fiduciaries of ERISA plans a standard of care in exercising their duties vis-a-vis participants.  29 U.S.C. § 1104.

The essence of plaintiff's ERISA claims against VNS is that VNS failed to appropriately inform her of the existence of the LTD Plan both at the time she was hired and enrolled, and in response to her inquiries about benefits eligibility at the time of her accident in 1998.  She alleges that it wasn't until her written request for information in August 2001 that she received a copy of her SPD and became aware of the existence of the plan.  By that time, and by the time she subsequently applied for the LTD benefits in October 2001, she had been time-barred by the terms of the policy.  Out of these events, plaintiff states claims for breach of fiduciary duty and concealment, both actionable under 29. U.S.C. §1132(a)(3), the latter also actionable under §1132(a)(1)(a).

At the outset, both of plaintiff's stated ERISA claims against VNS are premised on the failure of VNS to provide complete and accurate information about the existence of the plan and the plan's terms, as opposed to recovery on the basis of the contractual terms of the plan.  Compare Weinreb v. Hospital for Joint Diseases Orthopaedic Inst., 404 F.3d 167 and Burke v. Kodak Retirement Income Plan, 336 F.3d 103 (2d Cir.2003) (recovery based on failure to provide complete and accurate information) with Feifer v. Prudential Ins. Co. of America, 306 F.3d 1202 (2d Cir.2002) (recovery under terms of

the plan).  This is necessarily so, as plaintiff acknowledges that decisions relating to whether or not plan beneficiaries are awarded coverage are within the exclusive control of Unum.  (<u>56.1</u>, ¶9).  It is of legal significance because this Circuit requires a threshold showing of "likely prejudice" where an ERISA claim is premised on incomplete or inaccurate information.  <u>See</u> <u>Weinreb</u>, 404 F.3d at 171.

"[W]e require, for a showing of prejudice, that a plan participant or beneficiary was <u>likely</u> to have been harmed as a result of a deficient SPD.  Where a participant makes this initial showing, however, the employer may rebut it through evidence that the deficient SPD was in effect a harmless error."  <u>Burke</u>, 336 F.3d at 113 (emphasis in original).   In adopting this standard, the Circuit expressly considered, and declined to adopt, a <u>possible</u> prejudice standard.  <u>Burke</u> at 113.  The emphasis on the word "likely" indicates the heightened showing required in order to survive a summary judgment motion on a deficient-SPD claim; rather than simply identifying a factual dispute that possibly prejudiced plaintiff, e.g., that plaintiff might have filed for and received benefits had the SPD not been deficient, plaintiff must provide sufficient evidence on which an inference could be based that she would have filed for the benefits but for the deficiency in the SPD.  <u>Cf.</u> <u>Sheehan v. Metropolitan Life Insurance</u>, 368 F.Supp. 2d 228, 262 (S.D.N.Y.2005) ("likely prejudice to a plaintiff will be presumed if, as the result of an SPD deficiency, he was not aware of the need to take an action within his control (submitting an affidavit, filing a law suit) which would have avoided the restriction on eligibility for benefits, and consequently failed to take that action.") (emphasis added).  <u>See also</u> <u>Layaou v. Xerox Corp.</u>, 330 F.Supp.2d 297 (W.D.N.Y.2004); <u>Manginaro v. Welfare Fund of Local 771, I.A.T.S.E.</u>, 21 F.Supp.2d 284 (S.D.N.Y.1998).

24

This requirement has recently been extended by the Second Circuit to claims "premised on the complete absence of an SPD." <u>Weinreb</u>, 404 F.3d at 171. <u>Weinreb</u>, like this case, involved an allegation that an SPD was not distributed to employees. As a result, the plaintiff widow alleged, the potential participant failed to fill out an enrollment form and was thus ineligible for life insurance benefits when he died suddenly. The employer provided undisputed evidence, however, that it had notified the potential participant numerous times about the existence of the plan, and the court found that the district court properly held that those efforts were sufficient to place Dr. Weinreb on notice of the Plan's enrollment requirements. The court noted that "although ERISA's SPD requirement places the burden of communicating eligibility conditions on the employer, it would be unfair to hold the employer liable when a claimant fails to adhere to a known plan requirement through "procrastination," "indecision," or the like." <u>Id.</u> at 172.

Exarhakis has failed to show that she was "likely prejudiced" by the failure to distribute the SPD. Her own testimony strongly suggests that even had she known about the LTD Plan, she would still have returned to work as quickly as possible for income and health benefits, both of which would have been less generous under the LTD Plan. (<u>See</u> <u>Ex. Dep</u>. at 43-44, 71). Plaintiff's testimony that she "had been hoping to maintain sufficient employment that [she] would not need any kind of disability benefits," that she viewed the new position offered to her as "an opportunity for salvation," that she "wanted to go right back" and that she "had every intention of returning to work prior to March 31, 1999," belies any inference that a failure to notify her of the LTD Plan, and her failure to elect its benefits which would have precluded her

from working, prejudiced her.  (Ex Dep. 239, 416-417, 52, 68).

If VNS did not distribute a copy of the SPD at the new employee orientation, that failure to distribute the plan would constitute harmless error in this case.[3]  This is not a case where the plaintiff claims that she based her actions (or lack of actions) upon a deficient or misleading SPD, See generally Burke, 336 F.3d 103; Layou, 330 F.Supp.2d 297.  Rather, she contends that she had no knowledge that the plan existed, and if she had known that the plan existed, she would have pursued her benefits options more fully at an earlier date.  (See Rosen Aff., Exhibit 4, PX39 at 2 ("Had I known of the LTD policy, the likely scenario is that I would have qualified for the LTD coverage . . .") (emphasis added)).  Plaintiff acknowledges receiving, though not reading, the annual benefits statements that were mailed to her beginning in 1997.  Had she or Ms. Morris either read those statements when she received them, or reviewed them after her accident, she would have known about the existence of the LTD Plan, been able to ask specific questions about its terms and conditions, and considered applying for its benefits.  To paraphrase the Weinreb court, though ERISA imposes upon an employer an obligation to notify its employees about the terms and conditions of benefits packages, it would be unfair to hold that employer responsible when an employee claims ignorance of the plan's existence, despite receiving actual notice that the plan exists.  Under these circumstances, the missing SPD was harmless error. See Weinreb, 404 F.3d

---

[3]  The Court notes a subtle, but significant, inconsistency between Ms. Exarhakis's deposition testimony and the affidavit she submitted with her summary judgment motion.  In the former, she testified that she did not recall whether or not she received the SPD at the time she was hired, (See Ex. Dep. 167).  In the latter, she states definitively that she did not receive the SPD.  Where deposition and affidavit testimony conflict, the deposition testimony is presumed to be more accurate.  See White v. ABCO Engineering Corp., 221 F.3d 293, 305 (2d Cir.2000).

at 172.

**V.    Claims Against Unum**

Plaintiff has asserted two additional claims, against defendant Unum, (1) for

common law "breach of contract" and (2) for denial of benefits under ERISA.

The Supreme Court has held that:

[T]he civil enforcement provisions of ERISA § 502(a) [is]the exclusive vehicle for
actions by ERISA-plan participants and beneficiaries asserting improper
processing of a claim for benefits, and that varying state causes of action for
claims within the scope of § 502(a) would pose an obstacle to the purposes and
objectives of Congress.

Pilot Life Ins. Co. v. Dedeaux,  481 U.S. 41, 52 (1987).  The breach of contract claim is

pre-empted by ERISA and must be dismissed.  Accord Smith v. Dunham-Bush, Inc., 959

F.2d 6 (2d Cir.1992).

Plaintiff's second claim is asserted under 29 U.S.C.A. §1132(a)(1)(b).  That section

authorizes a civil action by a participant in an ERISA benefits plan, "to recover benefits

due to him under the terms of his plan, to enforce his rights under the terms of the plan,

or to clarify his rights to future benefits under the terms of the plan." Id.  This requires a

determination as to what benefits are due; if no benefits are due, then the claim must

fail.

Plaintiff filed a claim for benefits, dated October 21, 2001, in which she sought to

recover for a disability that she contended began more than 3 years earlier.  Unum

denied her claim, and affirmed that denial on administrative appeal, on the basis that it

was untimely filed.

Plaintiff concedes that from the date of her disability, she gave neither notice of

the claim within 30 days, nor proof of claim within 90 days as the policy requires;

however, she points to a conditional clause in the policy that require the insured to submit notice of a claim "within 30 days of the date disability starts, if that is possible." (<u>Gordon Aff.</u>, Exhibit A, FUL CL 125).  The proof of claim requirement has a similar condition.  She argues that it was not possible to file her claim within 30 days of the disability's occurrence, and that she "gave notice as soon as it was reasonably possible for [her] to do so." (<u>Gordon Aff.</u>, Exhibit A, FUL CL 68).  In the alternative, plaintiff essentially seeks equitable tolling of the claims period on the basis of her disability.

The question of how a federal court should review an ERISA claim premised on denial of benefits as a result of untimely notice of claim has been recently, and very thoroughly, treated in <u>Doe v. Cigna Life Ins. Co. of New York</u>, 304 F.Supp.2d 477 (W.D.N.Y.2004).  The abridged version of Doe is that Unum's decision "may be overturned only if the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" <u>Kinstler v. First Reliance Std. Life Ins. Co.</u>, 181 F.3d 243, 249 (2d Cir.1999) quoting <u>Pagan v. NYNEX Pension Plan</u>, 52 F.3d 438, 442 (2d Cir.1995).  "On the question of late notice, the issue before the court is whether there is a genuine issue of material fact as to whether [the insurer's] decision that Plaintiff did not provide timely notice of his disability claim was arbitrary and capricious." <u>Doe</u>, 304 F.Supp. at 491.

This Court does not find Unum's decision arbitrary and capricious.  Justifications for notice of occurence provisions are myriad, including to allow early investigation into the particular circumstances of an occurrence, both as an aid to future litigation and as a means of ending or correcting dangerous conditions; to assist insurers in estimating the amount of capital they need in reserve for future claims, and the amounts they must

charge as premiums; and to detect fraudulent claims.  See, e.g., Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc., 822 F.2d 267, (2d Cir.1987); Utica Mut. Ins. Co. v. Fireman's Fund Ins. Cos., 748 F.2d 118, 121 (2d Cir.1984); Heydt Contracting Corp. v. American Assurance Co., 146 A.D.2d 497, 536, appeal dismissed, 74 N.Y.2d 651, (1989); Power Authority v. Westinghouse Electric Corp., 117 A.D.2d 336, (1986). Plaintiff acknowledges that she did not file until more than three years after her injury, far beyond the 30-day notice required by the policy.

The simplest reason for upholding Unum's decision, however, is that plaintiff did not, as she asserts, submit the claim as soon as reasonably possible.  Even if her alleged unawareness of the policy's existence until August 2001 made it not reasonably possible for her to notify Unum of a claim before that time, a contention of dubious weight, see Olin Corp. v. Insurance Co. of North America, 966 F.2d 718 (2d Cir.1992) (unawareness of policy not a valid excuse for delay), plaintiff acknowledges that she received a copy of her SPD in August 2001.  She did not notify Unum until she filed her claim on October 21, more than 50 days later.  That she was physically and mentally able to notify Unum of her claim within 30 days of receiving the SPD is evidenced by the voluminous correspondence between plaintiff and VNS during this period, (see Fl. Aff., Exhibit 20, DX 23, 34), as well as her simultaneously filed SSDI application, (see Fl. Aff., Exhibit 24).

Plaintiff's appeal for equitable tolling on the basis of her disability is also unavailing.  Equitable tolling is used where "necessary to prevent unfairness to a plaintiff who is not at fault for her lateness in filing."  See Haekal v. Refco, Inc., 198 F.3d 37, 43 (2d Cir.1999).  "[It] is an extraordinary measure that applies only when plaintiff is

prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances."  See Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96 (1990).  Setting aside the question of whether she could have notified Unum before August 2001, plaintiff's suggestion that it was her disability which precluded her from filing before October, and not some failure of her own diligence, is not persuasive given the SSDI application that she was able to fill out, the work she had been able to perform for two years, and her correspondence with VNS.

Because she failed to comply with the provisions of the LTD policy, Unum's denial of benefits was neither arbitrary nor capricious.  Because no benefits are due, plaintiff cannot recover against Unum under ERISA.

## CONCLUSION

For the foregoing reasons, VNS's motion for summary judgment is granted with respect to the A.D.A, Rehabilitation Act, NYSHRL, NYCHRL, and ERISA claims.  Unum's motion to dismiss the breach of contract claim is granted and its motion for summary judgment on the ERISA denial of benefits claim is granted.  The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated:      Brooklyn, New York
           February 13, 2006.

_____/s/_____
I. Leo Glasser
United States District Judge

Copies of the foregoing memorandum and order were sent to:

<u>Counsel for the Plaintiff</u>

Steven A. Rosen
Law Offices of Steven A. Rosen
501 Fifth Avenue
Suite 1900
New York, NY 10017

<u>Counsel for the Defendant</u>

Tonianne Florentino
Collazo Carling & Mish LLP
747 Third Avenue
25th Floor
New York, NY 10017

John P. Keil
Collazo, Carling & Mish, LLP
747 Third Avenue
New York, NY 10017

Evan L. Gordon, Esq.
150 East 58th Street
Suite 2310
New York, NY 10155